UNITED STATES of America,
Appellant,

v.

R. L. ROBERSON, owner of One 1954 Green 98 Oldsmobile Four Door Sedan Motor No. V–190281 and J. C. Burkett, Appellees.

No. 15865.

United States Court of Appeals
Fifth Circuit.

May 15, 1956.

Joseph B. Bergen, Asst. U. S. Atty., Savannah, Ga., William C. Calhoun, U. S. Atty., Augusta, Ga., for appellant.

Benjamin Smith, Jr., Waycross, Ga., for appellees.

Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

The Government appeals from a judgment denying forfeiture of an automobile seized and libeled because of its alleged use in violations of the provisions of the United States Code Annotated covering Wagering Taxes.[1] The case

---

1. 26 U.S.C.A. Chapter 27A, I.R.C.1939.

The libel alleges in part: "That the above-described property was used on August 28, 1954, by J. C. Burkett in violation of the Internal Revenue Laws of the United States in operation of the business of receiving wagers without having paid the special wagering occupational tax and without having registered, as required by Sections 3290 and 3291 of the

was tried before the Court without a jury and the Court, in its verdict and judgment, found that the automobile was not involved in any violation charged, and ordered it released.[2] The only issue here is whether the Court's findings are clearly erroneous.

The Government relied upon the testimony of the chief of police of Waycross, Georgia, and a Special Agent of the Intelligence Division of the Treasury Department. The two had obtained a search warrant for Burkett and the automobile. Both had been under surveillance by the local police for some time. The police had also been keeping the fishmarket operated by Burkett under surveillance. They were suspicious of Burkett as being engaged in the sale of "Bolita tickets" and of his fishmarket as being a place where such business was carried on.

The Government agent and the chief of police arrested Burkett as soon as he drove in front of the fishmarket and stopped. The car was searched and nothing was found in it except extra automobile tags. It was the policeman's best recollection that, on the day of the search, the car bore a Florida tag and that a Georgia tag was found on the back seat. He had seen the car being operated sometimes bearing the tag of Georgia and sometimes the tag of Florida. Its owner, Roberson, had been a resident of Waycross, Georgia, but had recently moved to Florida.

As stated in the Court's findings, in Burkett's wallet was found certain adding machine tapes and a piece of wrapping paper on which there were notations which the special agent was called upon to decipher. Testifying as an expert, he

Internal Revenue Code of the United States of 1939; more specifically, the said J. C. Burkett was using the above-described property in the operation of said business in transporting wager and lottery tickets used in said business of receiving wagers, with intent to defraud the United States of said special occupational tax."

2. The Findings of the Court below follow:
"Upon the day named in the libel, August 28th, 1954, the automobile in question was being driven by J. D. Burkett. Burkett had no previous criminal record in the State or Federal Courts. He was the operator of a retail fish business in the west part of Waycross. He was arrested at 11:10 a. m. by Waycross Police and Federal Officers as he was about to enter his place of business. The automobile which he had driven up to the business was owned by R. L. Robinson of Fernandina, Florida. No lottery paraphernalia was found inside of the car or in any part of the car itself. On the back seat were two license plates: One Georgia; and one Florida.

"In Burkett's bill-fold were found four adding machine tapes and $155.00 in cash. The adding machine tapes had unexplained markings on them and officers of the United States testified that they were similar to those used by lottery violators and explained that the markings on the tapes were to show how much money was bet on a number, how much was won or lost and that, in their opinion, the adding machine tapes were undoubtedly lot-

tery paraphernalia. The tapes appeared to be worn and had been carried for some few days.

"Chief Ball of the Waycross Police testified that the fishmarket was a 'known Bolita Place.' He was not able to substantiate this statement by any positive knowledge or evidence of any previous surveillance of the place. Admittedly he knew of no Bolita or lottery or other suspicious transactions that had taken place there.

"There was no evidence to show that Burkett had ever sold a lottery ticket of any kind. There was no evidence to show that he had received money as a wager on a lottery ticket. There was no evidence or testimony that he had been followed and made stops for the purpose of selling tickets. There was no evidence to show that he had assisted in any phase of a lottery transaction. No evidence was introduced before the Court to show that the automobile, which was a borrowed one, was involved to any extent whatsoever in any lottery transaction on the day the arrest was made or any previous occasion. There was no evidence whatever that the owner of the car was guilty of any lottery violations.

"Based upon these findings of fact, the Court finds that libelled automobile Not Guilty of any violation of the Lottery Acts of the United States, and it is the Judgment of the Court that said automobile be released with costs assessed against the United States."

deduced from those writings that they were made in connection with a gambling business.

The policeman had taken charge of and retained these papers and the Government agent admitted that one of them "is an old one, and has a crease in the back indicating that it has been held for some time". As to the others, it was his opinion that they "were relatively new". The Court found that all of them were worn and had been carried for some few days. The exhibits are not before us and we are not able to examine this phase of the Court's findings.

The two officers readily admitted that they had no tangible proof that Burkett was in the gambling business or that his fishmarket was devoted to such a business or that the car had been used in connection with the illegal business beyond the fact that, on this particular trip, it transported Burkett to the point where he was arrested. This evidence, plus that relating to the two license tags, is all that the Government was able to produce. The suspicions of the officers may or may not have been well founded, but it is clear that the Government was not able to make proof sufficient to satisfy the judicial mind. The witnesses proffered the information that Burkett had stated that he had borrowed the car to make the trip across town and that Roberson was the owner of the car. Whether Burkett had ever used the car before that one trip was not shown.

There was no evidence that he made the trip in order to transport the papers found in his wallet. What evidence there was tended to show, as found by the Court, that the papers were several days old, which fact tended to negative the assumption indulged in by the Government that the one trip the car had made was for the purpose of transporting these records or aiding the business in connection with which they were made. Nor is there any proof that Roberson was even under suspicion as being engaged in the gambling business. The Government simply did not put on any proof from which it could be found that the car was being used or had ever been used in connection with an illegal business. The findings of the Court below were amply sustained by the meager evidence placed before it.

■ It is suggested that the failure of the claimant, Roberson, to testify and thereby explain the purpose for which the automobile was being used when it was seized was a fact which should have been taken against him. Unquestionably the failure of a defendant in a civil case to testify or offer other evidence within his ability to produce and which would explain or rebut a case made by the other side, may, in a proper case, be considered as a circumstance against him and may raise a presumption that the evidence would not be favorable to his position. Local 167 International Brotherhood of Teamsters v. United States, 1934, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804; Anderson v. United States, 5 Cir., 1950, 185 F.2d 343; Williams v. United States, 5 Cir., 1952, 199 F.2d 921, and Kent v. United States, 5 Cir., 1946, 157 F.2d 1.

It is equally well settled, however, that the failure of a party to testify and the permissible inference to be drawn therefrom will not convert evidence otherwise insufficient into a prima facie case. It will not excuse a failure of the Government to meet the burden of establishing facts sufficient to make out a case for forfeiture. Until the Government had sustained the burden of producing evidence establishing its right to forfeiture, the claimant had no call to bring forward any evidence at all, but was entitled to submit the case to the fact-finder, trusting solely to the weakness of the Government's evidence.

■ Corpus Juris Secundum[3] classifies this principle of law as a Pseudo-

3. 31 C.J.S., Evidence, § 118.

Presumption and discusses its effect in some detail, stating[4]: *"Necessity for prima facie case.* Where the party on whom the burden of proof rests has failed to make out a prima facie case, the absence of the adverse party, or his failure to testify, raises no unfavorable inference against him." This Court[5] recognized in a libel case the inference allowable against a party who fails to testify and supply information within his knowledge but called attention to the limitations on this rule: "This is not to say that [defendant's] silence could supply a complete failure of proof. It is to say, though, that with the proof as it was, having at the least a strong tendency to prove the case for forfeiture, claimant's failure to offer any explanation of the incriminating circumstances could be taken against him."

 It is not necessary to discuss the effect of the permissible presumption in a proper case because it is clear here that the Government's proof did not establish even a prima facie case for forfeiture. It was necessary for the Government's evidence, of itself, to be sufficient to support the judgment sought. The Government's evidence, and all inferences which may be drawn therefrom, were entirely inadequate to support its demand for condemnation and forfeiture. We cannot say that, in the face of this weak showing, it was not natural and prudent for the claimant to introduce no evidence at all. He was in position to rest secure upon the failure of the Government to make proof which would justify forfeiture. Under these circumstances, the failure of the claimant to testify cannot work against him so as to supply a case where, before, none existed.

The judgment appealed from was proper and is

Affirmed.

4. Ib., § 156(d), p. 862.

5. Stagner v. United States, 5 Cir., 1952, 197 F.2d 992, at page 994. And see also United States v. Mammoth Oil Co.,

8 Cir., 1926, 14 F.2d 705; and II Wigmore on Evidence, Sec. 290, p. 179, and 1955 Pocket Supplement p. 57.