**UNITED STATES of America, Plaintiff,**

v.

**ONE 1978 CADILLAC SEDAN DE VILLE, NEW YORK LICENSE PLATE NO. 533 JPY, Defendant-in-Rem.**

**No. 79 Civ. 601 (WCC).**

United States District Court, S. D. New York.

Jan. 7, 1980.

---

**38.** *See* Fed.R.Evid. 611(a).

**39.** *See* 3 Weinstein, *United States Rules* ¶ 611[01] at 611–15 to 16.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for the United States of America; Marjorie A. Silver, Sp. Asst. U. S. Atty., Kent T. Stauffer, Asst. U. S. Atty., New York City, of counsel.

Orenstein, Snitow, Sutak & Pollack, P. C., New York City, for claimant, Harold D. Levine; Franklyn H. Snitow, William H. Pauley, III, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

In this proceeding, the Government seeks forfeiture[1] pursuant to 26 U.S.C. § 7302[2] of an automobile (the "Cadillac") belonging to Harold D. Levine ("Levine"), on the ground that the Cadillac was used in furtherance of a gambling operation for which taxes have not been paid nor registration made in violation of 26 U.S.C. §§ 4401, 4411, 4412.[3] A bench trial was held on March 19, 1979. This opinion and order incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

1. The Cadillac has a value in excess of $2,500; judicial action is therefore necessary to enforce the vehicle's forfeiture pursuant to 26 U.S.C. § 7323. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345, 1355.

2. 26 U.S.C. § 7302 provides in pertinent part:

"It shall be unlawful to have or possess any property intended for use in violating the provisions of the internal revenue laws, or regulations prescribed under such laws, or which has been so used, and no property rights shall exist in any such property."

3. 26 U.S.C. § 4401 provides in pertinent part:

"(a) *Wagers.*—There shall be imposed on wagers, as defined in section 4421, an excise tax equal to 2 percent of the amount thereof.

\* \* \* \* \* \*

"(c) *Persons liable for tax.*—Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him. Each person who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery. Any person required to register under section 4412 who receives wagers for or on behalf of another person without having registered under section 4412 the name and place of residence of such other person shall be liable for and shall pay the tax under this subchapter on all such wagers received by him."

26 U.S.C. § 4411 provides in pertinent part:

"There shall be imposed a special tax of $500 per year to be paid by each person who is liable for tax under section 4401 or who is engaged in receiving wagers for or on behalf of any person so liable."

26 U.S.C. § 4412 provides:

"(a) *Requirement.*—Each person required to pay a special tax under this subchapter shall register with the official in charge of the internal revenue district—

(1) his name and place of residence;

(2) if he is liable for tax under subchapter A, each place of business where the activity which makes him so liable is carried on, and the name and place of residence of each person who is engaged in receiving wagers for him or on his behalf; and

(3) if he is engaged in receiving wagers for or on behalf of any person liable for tax under subchapter A, the name and place of residence of each such person.

"(b) *Firm or company.*—Where subsection (a) requires the name and place of residence of a firm or company to be registered, the names and places of residence of the several persons constituting the firm or company shall be registered.

"(c) *Supplemental information.*—In accordance with regulations prescribed by the Secretary, the Secretary may require from time to time such supplemental information from any person required to register under this section as may be needful to the enforcement of this chapter."

*Procedural Background*

The Cadillac was seized by special agents of the Criminal Investigation Division (the "Division") of the Internal Revenue Service (the "IRS") on September 17, 1978, pursuant to a search warrant[4] issued by Magistrate Jacobs of this court, and was transported to a garage leased by the Government where the automobile was searched and its contents inventoried. Following this search, the Cadillac was retained by the Government.

On October 13, 1978, Levine's attorney, in a letter to William DePugh ("DePugh") Chief of the Division in Manhattan, demanded that the Government return the automobile to Levine. By letter dated October 16, 1978, a representative of the IRS informed Levine's counsel that his letter of October 13 would be considered by the Department of Justice as a Petition for Remission or Mitigation, see 28 C.F.R. § 9.1 *et seq.* Hearing nothing further from the Government, on October 28, 1978 Levine instituted suit ("the Levine action") against the United States and DePugh, seeking return of his automobile and damages for the loss of its use. In the Government's answer of December 29, 1978 to Levine's action, it raised as an affirmative defense that Levine's Cadillac was subject to judicial forfeiture pursuant to 26 U.S.C. § 7302, and that the Government intended to commence a forfeiture proceeding "forthwith." At a pretrial conference on January 9, 1979, the Government informed the Court that it would institute a forfeiture proceeding; the Government commenced the forfeiture proceeding on February 2, 1979 and that case was assigned to this Court as related to the Levine action. It was subsequently decided by the parties that they would proceed via the Government's forfeiture action and, by stipulation of the parties, the Levine action was discontinued.

*The Testimony*

The Government contends that Levine's Cadillac was used in furtherance of an alleged bookmaking operation involving sports betting being conducted by James Pisacano ("Pisacano") with the assistance of Levine. Five special agents of the Division testified with respect to their observations of Pisacano and Levine on eight separate occasions in 1978. Anthony Carpiniello ("Carpiniello"), Group Manager of the IRS Division, who has had extensive experience in criminal investigations of gambling, testified as the Government's expert witness.

1.  The Fundamentals of a Gambling Operation

Carpiniello described how a typical sports betting operation is conducted: There is a "wire room" where the bookmaker receives wagers from bettors. The bookmaker usually arrives at the wire room at about 11:30 A.M. He then gets the "lines" (odds) and organizes his papers, and he starts accepting wagers at about 12:00 o'clock. Wagers are accepted from 12:00 P.M. to 2:00 P.M., when sports events normally begin. The bookmaker leaves the wire room after 2:00 P.M., and he returns at about 5:30 P.M. to begin accepting wagers on evening games. ·

The bookmaker records the wagers on triplicate slips of paper. At the end of the day, the bookmaker transfers these slips of paper to "figure men" who compute the winnings and losses of each bettor. The next morning, prior to returning to the wire room, the bookmaker picks up the slips from the figure men. In addition to taking wagers from bettors, a bookmaker might also meet with bettors after 2:00 P.M. or after the evening games have commenced in order to "settle up" with the bettors, *i. e.,* collect from each bettor the monies owed to the bookmaker or pay the bettor his winnings.

Carpiniello testified that an automobile could be utilized in a gambling operation of this type in several ways: (1) to provide the bookmaker with transportation to and from his meetings with bettors; (2) to pick up the slips from the figure men; and (3) to transport gambling records and paraphernalia.

---

4.  The parties have stipulated that, for purposes of this *in rem* proceeding, the search warrant authorizing seizure of the Cadillac was legally sufficient.

## 2. The Fruits of the Surveillance

The special agents monitored Pisacano's and Levine's activities in New York City on eight days. On the basis of these observations, the agents concluded that Pisacano operated a wire room at 165 East 83rd Street in Manhattan. At trial, the agents testified with respect to what they observed as follows:

### a. June 13, 1978

Special Agent Thomas Loreto testified that on June 13 he was following the Cadillac, which Levine was driving. Levine stopped at 332 East 73rd Street shortly after 2:00 P.M., where he picked up Pisacano. Shortly thereafter, Loreto saw Pisacano throw a crumpled piece of paper out of the window of the Cadillac. Loreto retrieved the paper from the street. Carpiniello testified that the paper was a "pay and collect slip"—a record which indicates to a bookmaker how much a particular bettor owes to or is owed by the bookmaker.

### b. July 28, 1978

Special Agent Patrick Convery testified that on July 28, at around 11:00 A.M., he saw Levine park the Cadillac on the corner of East 86th Street and Second Avenue in Manhattan, walk to a nearby newsstand, and return to the Cadillac carrying a folded newspaper with an envelope placed on top of it.

### c. August 1, 1978

Special Agent John McTigue testified that at about 11:30 A.M. on August 1, 1978, he observed Levine park the Cadillac on the corner of East 86th Street and Second Avenue. A male passenger in the car went to what was apparently the same newsstand at which Levine had purchased a newspaper on July 28, gave the woman at the newsstand some currency and received in return some coins, a newspaper, an envelope and some folded legal-size yellow foolscap. The man put the envelope and the paper inside the newspaper and got back into the Cadillac. Special Agent Stephen Callan testified that he then saw Levine and a passenger drive up to 165 East 83rd Street, where the agents suspected the wire room was located, and that Levine left the car and entered the building carrying a newspaper.

Carpiniello testified that the papers that were concealed in the newspaper could have contained computations of the prior day's bookmaking activities.

### d. August 2, 1978

Convery testified that on August 2, 1978, at about 2:20 P.M., he observed Levine driving the Cadillac to East 77th Street and First Avenue. An unknown person got into the back seat of the Cadillac and handed some currency to Levine in the front seat. The package of currency was flat and was between one-eighth and one-quarter inch thick.

### e. August 29, 1978

Callan testified that at about 2:00 P.M. on August 29, 1978 he observed the Cadillac parked at Lexington Avenue and East 83rd Street. In the Cadillac he saw a yellow manila envelope with the following writing on it:

| P | |
|------|-------|
| Mike | 5,910 |
| Joe | 7,800 |
| Jack | 2,000. |

A few minutes later, Callan saw Levine leave 165 East 83rd Street and get into the Cadillac. Pisacano joined Levine about five minutes later and the two drove off. While Callan was following the Cadillac, he saw Levine holding a stack of currency.

Carpiniello testified that the writing on the envelope represented common bookmaking notes. For example, "Mike" would refer to the bettor and the figure next to his name would indicate the amount of money to be paid to that bettor by the bookmaker.

### f. September 3, 1978

McTigue testified that at about 3:00 P.M. on September 3, 1978 he was stationed at East 83rd Street and Third Avenue where the Cadillac was parked. A red automobile

pulled up; the driver got out and went to an open telephone booth on the corner. McTigue was standing around seven feet from the telephone booth; he saw the man make a call, and overheard the man make such comments as: "I have the money . .. Can you take my action? . . . I'm on the corner of 83rd Street . . .. It will only take a minute . . .. I will wait for you." About five minutes later, Levine came out of 165 East 83rd Street and approached the Cadillac where he met with the other man, who then removed what appeared to be a roll of currency about an inch thick from his pocket. The two men entered the Cadillac and the unidentified man gave Levine the currency. Levine left the car and returned to 165 East 83rd Street. On cross-examination, McTigue testified that Levine did not appear to "be taking [the man's] action" while he was in the car; Levine merely counted the currency the man gave him.

g. September 7, 1978

McTigue testified that at about 5:00 P.M. on September 7 he and another agent went to 165 East 83rd Street. From their position on the roof, the agents observed first Pisacano, and then Levine, enter apartment 5–D with a key. About five minutes after Levine appeared, the agents heard the sound of a radio or television in the apartment announcing what appeared to be racing results. As the agents left the building, they noted that the mailbox to apartment 5–D bore the name "A. Rosen."

h. September 17, 1978

On that day, the agents searched apartment 5–D and the Cadillac. When the agents entered the apartment, they saw Levine on the telephone while making notes on slips of paper. The apartment was small and sparsely furnished: it contained only a long folding table, some folding chairs, three telephones, a television set and a radio.

Carpiniello testified that he took Levine's place at the telephone and began accepting calls. The calls were typical of those that would come into a wire room. The caller would identify himself with a code name and ask for the "lines" on certain games. Carpiniello saw the line sheets on the table and gave callers the line. Some callers actually placed bets with Carpiniello; others asked for "Harold" or "Jimmy" (Levine or Pisacano) and hung up when told they were not there.

Special Agent Glen Ripa testified that a search of the Cadillac on September 17 produced a white box with about 90 football betting cards for September 16 and 17 and a telephone bill for apartment 5–D in the name of A. Rosen in the front seat; a schedule of college and national football games behind the sun visor; a checkbook belonging to Levine on the back of which were several notations in the glove compartment.

With respect to the items found in the car, Carpiniello testified that although a bettor might carry a schedule of games such as was found in the Cadillac, only a bookmaker would possess 90 football betting cards. Carpiniello inspected the notations on the back of Levine's checkbook and stated that the notations were incomplete notes of a wager on a Philadelphia team, as indicated by the bookmaker's symbols used by the writer.

Claimant introduced no evidence to controvert the inferences arising from the testimony adduced by the Government. The parties stipulated that, if called as a witness, Levine would assert his Fifth Amendment privilege.[5]

---

5. At trial, claimant's attorney stated that Levine was being forced to choose between remaining silent in the forfeiture proceeding and losing his automobile or "waiving" his Fifth Amendment privilege by testifying, thereby allowing the Government to "flush out evidence" it could use in the criminal investigation. It is true that the Supreme Court has expressly held that although a forfeiture proceeding is a civil *in rem* proceeding, the privilege against self-incrimination is applicable since forfeiture proceedings are "quasi-criminal." *United States v. United States Coin & Currency*, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971). The Government had the burden of establishing by a preponderance of the evidence that the Cad-

*The Contentions of the Parties*

The Government contends that the evidence it introduced at trial establishes, by a preponderance of the evidence, that the Cadillac was used in furtherance of the bookmaking operation conducted by Pisacano. Claimant Levine argues that the Government is not entitled to forfeiture of his automobile for two reasons: (1) the evidence the Government introduced at trial is legally insufficient to establish a *prima facie* case for forfeiture; and (2) the Government's delay in instituting a forfeiture proceeding with respect to the Cadillac violated Levine's due process rights under the Fifth Amendment.

*The Law*

1. The Forfeiture

Under Section 7302, an automobile is subject to forfeiture if it is property either intended for use or previously used "in violating the provisions of the internal revenue laws."

■ In a forfeiture proceeding, the burden is on the Government to establish, by a preponderance of the evidence, that the vehicle was used as an "active aid in violating the internal revenue laws." *United States v. General Motors Acceptance Corp.*, 239 F.2d 102, 104 (5th Cir. 1956). See also *United States v. Bride*, 308 F.2d 470 (9th Cir. 1962); *D'Agostino v. United States*, 261 F.2d 154 (9th Cir. 1958), *cert. denied*, 359 U.S. 953, 79 S.Ct. 739, 3 L.Ed.2d 760 (1959); *United States v. One 1955 Mercury Sedan*, 242 F.2d 429 (4th Cir. 1957).

■ It is well-settled that an automobile used only for the personal convenience of the owner as transportation to the site of the illicit operation is not subject to forfeiture. *United States v. Lane Motor Co.*, 344 U.S. 630, 73 S.Ct. 459, 97 L.Ed. 622 (1953); *Simpson v. United States*, 272 F.2d 229 (9th Cir. 1959); *United States v. General Motors Acceptance Corp.*, supra.

Many appellate courts have had occasion to comment upon the quantum of proof necessary to sustain a district court's finding that a vehicle was an active aid in an unlawful gambling enterprise and is thus subject to forfeiture. A review of cases in which courts have determined that the proof was sufficient to establish that the subject vehicle was used in violation of Section 7302, indicates that one or more of the following factors are usually present in those cases wherein forfeiture is upheld: (1) the automobile was used to distribute to bettors tickets or cards used to place wagers, see, *e. g., One 1961 Lincoln Continental Sedan v. United States*, 360 F.2d 467 (8th Cir. 1966); see also *United States v. One 1975 Thunderbird*, 576 F.2d 834 (10th Cir. 1978) (forfeiture action pursuant to 18 U.S.C. § 1955(d); § 7302 referred to as a "similar forfeiture provision"); (2) the automobile was used to transport bookmakers to meetings with bettors during which the bookmakers collected the amounts the bettors owed or paid the bettors their winnings, see, *e. g., United States v. Bride*, supra ("*Bride* case"); *D'Agostino v. United States*, supra; *United States v. One 1953 Oldsmobile*, 132 F.Supp. 14 (W.D.Ark.1955); and (3) there was demonstrated a substantial nexus between the vehicle and the unlawful gambling operation, including transportation of gambling paraphernalia, see, *e. g., United States v. One 1962 Cadillac*, 397 F.2d 796 (3rd Cir. 1968) (gambling records found in car matched those in wire room;

illac was subject to forfeiture, and it met that burden through the testimony of its agents. Thus, Levine's silence did not "supply a complete failure of proof." *Stagner v. United States*, 197 F.2d 992, 994 (5th Cir. 1952). See also *United States v. Leveson*, 262 F.2d 659 (5th Cir. 1959) ("once the Government made a *prima facie* case, it was entitled to prevail unless countervailing evidence was offered"); *United States v. Roberson*, 233 F.2d 517 (5th Cir. 1956) (when Government's evidence was not "sufficient to support the [forfeiture] judgment sought, . . . it was . . . natural and prudent for the claimant to introduce no evidence at all. He was in position to rest secure upon the failure of the Government to make proof which would justify forfeiture").

Although claimant may have had a novel Fifth Amendment theory in mind, this Court is without the benefit of his thinking: claimant's pretrial brief did not deal with this issue and when given an opportunity to submit a post-trial brief, claimant declined to do so.

car identified by expert as integral part of day-to-day activities of numbers lottery gambling business); *Wingo v. United States,* 266 F.2d 421 (5th Cir. 1959) (district court could properly consider that the operation of a lottery business requires a substantial use of cars to transport men, tickets, and money).

In several cases, the courts found that the Government had failed to establish that the car was being used to aid in an unlawful gambling operation. See, *e. g., United States v. Roberson,* 233 F.2d 517 (5th Cir. 1956) (no proof claimant was in gambling business; expert testimony that adding machine tape found in claimant's wallet was made in connection with gambling business insufficient). See also *United States v. Bride, supra* ("*De Falco* case") (district court's finding that automobile used by bookmaker in which gambling paraphernalia was found was not used in aid of gambling operation not clearly erroneous).

█ The Court finds that the uncontroverted circumstantial evidence introduced by the Government, and the rational inferences to be drawn therefrom, establish, by a preponderance of the evidence, that Levine's Cadillac was used as an active aid in an unlawful gambling operation,[6] rather than merely for Levine's personal use, and is thus subject to forfeiture under Section 7302.

The evidence establishes that apartment 5–D at 165 East 83rd Street was a "wire room," and that Levine was an active participant in the gambling operation conducted from that apartment. The Court is well aware that a vehicle is not subject to forfeiture merely because its owner is involved in a gambling operation, see discussion in

*United States v. One 1972 Datsun,* 378 F.Supp. 1200 (D.N.H.1974), but in the case at bar, the evidence establishes not only that Levine was an active participant in Pisacano's operation, but also that his automobile was used as an active aid in that operation.

First, the Cadillac appears to have been used on two occasions to collect monies from bettors. On August 2, Convery saw Levine pick up an individual in the Cadillac who got into the back seat of the car and handed Levine a substantial amount of currency. Also, on September 3, McTigue saw an individual get into the Cadillac, which was parked in front of the wire room, and hand Levine a large roll of currency.

Second, the Cadillac has a substantial nexus to the wire room and the entire gambling operation and was used to transport gambling paraphernalia. See *One 1962 Cadillac, supra; Wingo, supra.* The Government agents testified that they frequently saw the Cadillac near the wire room; a telephone bill for apartment 5–D, addressed to A. Rosen—the name on the bell for apartment 5–D—was found in the automobile. With respect to the gambling paraphernalia, on August 29 Callan observed an envelope with bookmaking notations in the Cadillac and when the automobile's contents were inventoried on September 17, a large number of football betting cards, as well as Levine's checkbook with bookmaker's notations on it, were found in the Cadillac. Furthermore, on two occasions the agents observed the Cadillac being used to transport envelopes that had been received from an individual at a newspaper stand; the Government's expert testified

---

**6.** In this action, claimant has stipulated that he has not paid the wagering excise tax imposed by 26 U.S.C. § 4401 or the special occupation tax imposed by 26 U.S.C. § 4411, nor has he registered with the IRS pursuant to 26 U.S.C. § 4412. Thus, the use of a car in aid of such an unregistered operation would violate § 7302.

The Court is aware that the Supreme Court held that the wagering tax provisions, as they were written prior to 1974, violated defendants' Fifth Amendment privilege against self-incrimination. *Marchetti v. United States,* 390 U.S.

39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). However, following these cases, Congress amended the statutory scheme: In 1977, the Second Circuit held that "[t]he 1974 revisions of the federal wagering tax laws and the concomitant change in Treasury Department practices have eliminated the 'real and appreciable' hazards of self-incrimination that existed under the prior law." *United States v. Sahadi,* 555 F.2d 23 (2d Cir. 1977).

that the envelopes may have contained gambling records.

For the foregoing reasons, the Government is entitled to forfeiture of the Cadillac unless Levine has established that the delay in instituting this action precludes forfeiture.

2. The Due Process Claim

Levine contends that the four-and-one-half-month delay between the time his automobile was seized and the time the Government commenced this forfeiture action violated his Fifth Amendment right to due process.

■ The due process clause of the Fifth Amendment dictates that an individual whose property has been confiscated by the Government be granted a hearing within a reasonable time after the seizure occurs. *United States v. Premises Known as 608 Taylor Avenue,* 584 F.2d 1297, 1304 (3d Cir. 1978) ("[D]ue process . . . requires forfeiture proceedings against seized property be brought without unreasonable delay"). Unreasonable delay between seizure and institution of a forfeiture proceeding may bar the Government from obtaining forfeiture of the claimant's property; the claimant would raise the due process violation as a defense to the Government's proceeding.

The cases in which the courts have determined that the period of delay was unreasonable involved substantially greater delays than the four-and-one-half-month lapse in the instant case. See *e. g., United States v. One 1970 Ford Pickup,* 564 F.2d 864 (9th Cir. 1977) (eleven-month delay unreasonable); *United States v. One Motor Yacht Named Mercury,* 527 F.2d 1112 (1st Cir. 1975) (twelve-and-one-half-month delay unreasonable); *Sarkisian v. United States,* 472 F.2d 468 (10th Cir. 1973) (fourteen-month delay unreasonable); *United States v. Eight (8) Rhodesian Stone Statues,* 449 F.Supp. 193 (C.D.Cal.1978) (sixteen-month delay unreasonable); *United States v. One (1) Douglas A–26B Aircraft,* 436 F.Supp. 1292 (S.D.Ga.1977) (eleven-month delay unreasonable); *United States v. A Quantity of*

*Gold Jewelry,* 379 F.Supp. 283 (C.D.Cal. 1974) (twenty-two-month delay unreasonable); *United States v. One 1971 Opel G.T.,* 360 F.Supp. 638 (C.D.Cal.1973) (twelve-and-one-half-month delay unreasonable). But see *United States v. One (1) 1972 Wood, 19 Foot Custom Boat,* 501 F.2d 1327 (5th Cir. 1974) (ten-month delay not unreasonable because investigation continuing). In addition, these decisions are distinguishable from the instant case in that they involved the customs laws, 19 U.S.C. §§ 1602, 1603, 1604, which expressly state that any seizure requiring the institution of legal proceedings be "promptly" reported to the United States Attorney and that the United States Attorney institute a forfeiture action "forthwith." See generally *Sarkisian v. United States, supra.* The internal revenue laws contain no such language. See 26 U.S.C. § 7301 *et seq.*

In several decisions under 21 U.S.C. § 881 (which requires that forfeiture actions be instituted "promptly"), periods of delay similar to the one that Levine experienced have been held not unreasonable. See, *e. g., United States v. One 1973 Buick Riviera Automobile,* 560 F.2d 897 (8th Cir. 1977) (five-month delay not unreasonable); *United States v. One 1977 Cadillac Broughm-Elegance,* No. 77 C. 2306 (E.D.N.Y., April 1979) (Neaher, J.) (five-month delay not unreasonable); *United States v. One 1973 Dodge Van,* 416 F.Supp. 43 (E.D.Mich.1976) (six-month delay not unreasonable when Government unable to serve claimant and when delays caused by ongoing criminal investigation); *United States v. One Volvo Sedan,* 393 F.Supp. 843 (C.D.Cal.1975) (two-month delay not unreasonable).

In *Boston v. Stephens,* 395 F.Supp. 1000 (S.D.Ohio 1975), the court held that a six-month delay constituted a violation of claimant's due process rights. The *Boston* claimant commenced an action for the return of his five vehicles, which were the basis of his livelihood; six months after the seizure, the customs officials had yet to refer the matter to the United States Attorney. In *Boston,* even after claimant filed suit, the Government failed to insti-

tute a forfeiture proceeding. In contrast, in the instant case, the Government raised the possibility that it would seek forfeiture of the Cadillac as early as October 16, 1978, in its letter to Levine's counsel, and again in its answer to the Levine action. The Government did bring a forfeiture action, though it was a full four-and-one-half months after the seizure.

The foregoing discussion makes clear that the delay in the instant case is not *per se* unreasonable.

However, the Court must still determine whether the delay was unreasonable under the circumstances of this case. In so doing, this Court is guided by the principles laid down in *Lee v. Thornton*, 538 F.2d 27 (2d Cir. 1976) wherein the court stated that

> "the need of . . . vehicle owners to be free from unreasonable detentions of their vehicles must be balanced against the cost and inconvenience to the government of providing some means of prompt determination of the legality of the individual detentions." *Id.* at 33 (relying on the Supreme Court's decision in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

*Lee* involved the seizure of a vehicle, pursuant to the summary forfeiture procedures of the Tariff Act of 1930, by customs officials at the Canadian border. That statute required that the claimant file a $250 bond to force the Government to initiate an adversarial proceeding. The court found that that procedure might present an insuperable obstacle to a claimant, who may be stranded at the border without any means of transportation and thus required that a prompt post-seizure hearing (within 72 hours) be held. The customs statutes discussed in *Lee* are readily distinguishable from the procedure under Section 7302, see *United States v. One 1977 Cadillac Broughm-Elegance, supra*; however, the balancing test articulated in *Lee* is applicable to determining whether the delay between seizure of the Cadillac and the institution of forfeiture proceedings was unreasonable in this case.

With respect to claimant's interest in the Cadillac, many courts have recognized the important interest of an individual in owning and operating a car: "For many individuals an automobile is the most valuable personal possession." *Tedeschi v. Blackwood*, 410 F.Supp. 34, 44 (D.Conn.1976). See also *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Almeida v. Lucey*, 372 F.Supp. 109 (D.Mass.), *aff'd*, 419 U.S. 806, 95 S.Ct. 22, 42 L.Ed.2d 36 (1974); *Hernandez v. European Auto Collision Inc.*, 487 F.2d 378 (2d Cir. 1973). Courts have also recognized that the retention of a "wasting asset," such as an automobile, requires particular promptness in instituting forfeiture actions. *United States v. One 1971 Opel GT, supra.*

It is true that Levine was inconvenienced by the Government's retention of his automobile for over four months before a forfeiture proceeding was instituted; however, Levine does not allege that he was unable to earn a living or that he was "stranded" by reason of this delay. Indeed, he declined to post bond for the return of his car pending determination of this action because he had already leased another automobile. Thus Levine's circumstances are readily distinguishable from those cases in which a claimant's dependency on the vehicle strongly influenced the court in determining whether the Government improperly delayed in acting on a request for return of the automobile. See, *e. g., Lee v. Thornton, supra; Boston v. Stephens, supra.*

With respect to the Government's interest, the parties stipulated that the Government is conducting an ongoing criminal investigation of the gambling operation allegedly conducted by Pisacano. In several decisions, the courts have commented upon the importance of such an investigation. See *Shea v. Gabriel*, 520 F.2d 879 (1st Cir. 1975) (the Government's interest in secrecy in its ongoing investigation outweighed claimant's interest in the temporary loss of his property); *United States v. One (1) 1972 Wood, 19 Foot Custom Boat, supra.* And although the Government did not provide the Court with details of this investigation either a trial or *in camera*, Levine did not

request that the Court inquire further into the details of the criminal investigation.

Balancing the interests at stake, as *Lee* instructs, the Court finds that the Government's interest in an ongoing criminal investigation prevails over Levine's temporary loss of his automobile and that the delay of four months in instituting this action does not preclude the Government from seeking forfeiture of the Cadillac. This Court agrees with Judge Neaher's observation in *United States v. One 1977 Cadillac Broughm-Elegance, supra,* involving a five-month delay in the institution of forfeiture proceedings under 21 U.S.C. § 881, that:

> "Under the circumstances, it cannot be said that the government unreasonably or without cause delayed its institution of forfeiture proceedings in violation of claimant's rights under statute or due process of law. The purpose of the forfeiture statutes is punitive and deterrent. See *Calero [-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663], 687–88, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452. Thus, in the circumstances presented, the court can see no purpose in holding that [the delay] . . . should deprive the government of the right to proceed against a vehicle which the government has established was used to facilitate the transportation and sale of a controlled substance, where claimant has shown no prejudice by the delay. Since the delay was not so unreasonable and unduly prejudicial as to violate claimant's rights to due process, the government is entitled to a judgment on its claim. See *United States v. One 1973 Buick Riviera* (8th Cir. 1977)." Slip op. at 19.

The Cadillac is declared forfeited to the United States. Judgment will accordingly be entered for the United States.

SO ORDERED.