United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 17, 1998 Decided April 7, 1998

 No. 97-1387

 Overnite Transportation Company, 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 International Brotherhood of Teamsters, Local 728 

 Intervenor

 On Petition for Review and Cross-Application

 for Enforcement of an Order of the

 National Labor Relations Board

 John N. Raudabaugh argued the cause for petitioner, with 
whom Christopher A. Johlie and Kenneth F. Sparks were on 
the briefs.


 Jill A. Griffin, Attorney, National Labor Relations Board, 
argued the cause for respondent, with whom Linda Sher, 
Associate General Counsel, Aileen A. Armstrong, Deputy 
Associate General Counsel, and Frederick L. Cornnell, Jr., 
Supervisory Attorney, were on the brief.

 James D. Fagan, Jr., and Robert S. Giolito were on the 
brief for intervenor International Brotherhood of Teamsters, 
Local 728.

 Before: Wald, Silberman and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Wald.

 Wald, Circuit Judge: This dispute arose out of a union 
election conducted at the Atlanta Service Center of Overnite 
Transportation Company ("Overnite") on April 17, 1995, by 
the National Labor Relations Board ("NLRB" or "Board"). 
The International Brotherhood of Teamsters, Local 728 ("un-
ion") won the election by a wide margin. Nonetheless, Over-
nite refused to bargain with the union on the grounds that the 
union had engaged in unlawful pre-election and election day 
video and photographic surveillance of employees and unlaw-
ful electioneering, thereby destroying the conditions required 
for a free and fair election. In Overnite's final appeal before 
the Board, the Board granted the NLRB's motion for sum-
mary judgment, holding that the union was the properly 
elected bargaining agent for employees at Overnite's Atlanta 
facility and that Overnite violated sections 8(a)(1) and (5) of 
the National Labor Relations Act ("Act") when it refused to 
bargain with the union. Overnite filed a petition for review 
with this court, arguing for a remand to the Board with 
instructions to decide the case in light of its forthcoming 
decision in two consolidated cases, Flamingo Hilton-Reno, 
Case No. 32-CA-14378 and Randell Warehouse of Arizona, 
Inc., Case No. 28-RC-5274, which Overnite claims address 
issues substantially similar to the case at hand. Alternative-
ly, Overnite asks this court to deny enforcement of the 
Board's order, thus permitting a new election. We hold that 
the pre-election and election day videotaping and photograph-
ing of Overnite employees did not constitute unlawful surveil-


lance sufficient to invalidate the union election, that there was 
no unlawful electioneering by the union, and that the Board 
reasonably refused to delay certification of the union. Ac-
cordingly, we deny Overnite's petition for review and grant 
the Board's cross-petition for enforcement.

 I. Factual and Procedural Background

 Overnite points to four separate instances in which it 
argues agents of the union engaged in impermissible conduct. 
The first incident occurred approximately two weeks before 
the election. John Blow, an Overnite employee, attended a 
meeting at Local 728's union hall. Blow, who was pro-
company, testified that he saw Local 728's Secretary video-
taping employees as they left the union hall. See Transcript 
at 377-79, 405-06 (May 9, 1996) (testimony of John Blow). 
He also testified that no one explained why the Secretary was 
videotaping the attendees. See id. at 378.

 A second incident occurred on Tuesday, April 11. Employ-
ee Parker Roberts testified that Overnite President Jim 
Douglas and Overnite Vice President Paul Heaton visited the 
Atlanta Service Center. See Transcript at 466-67 (May 9, 
1996) (testimony of Parker Roberts). During the visit, union 
supporters took photographs of Douglas, Heaton, and em-
ployees with whom they spoke, including Roberts. See id. at 
467. Roberts testified that he believed that the photographs 
would be used to intimidate employees who supported the 
company. See id. at 467-68.

 A third incident occurred in the late afternoon and early 
evening of Friday, April 14, 1995. Three employees testified 
that when they arrived for work at the Atlanta facility, they 
saw a crowd of union supporters gathered in the driveway 
area, a few of whom were taking pictures and one of whom 
was using a videocamera. That same day, several employees 
gathered in the break room of Overnite's Atlanta facility to 
discuss an upcoming union election. After a "heated argu-
ment," employee Dennis McConley, a member of the Union 
Organizing Committee who had actively campaigned for the 
union and who was later elected a union steward, left the 


break room and returned with a video camera. McConley did 
not explain the purpose of the videotaping, and there is no 
evidence that anyone asked why he was videotaping. Two 
pro-company employees, John Sibley and Tim Carter, left the 
room soon after McConley entered with the videocamera 
because they were concerned that the videotape would be 
used to retaliate against them for taking an anti-Teamster 
position. See Transcript at 273-79 (May 9, 1996) (testimony 
of John Sibley); Transcript at 518-23 (May 9, 1996) (testimo-
ny of Tim Carter).

 Finally, Overnite claims that on the day of the union 
election, there was a crowd of about 100 union supporters, 
including International Organizer Keith Maddox, Teamster 
President Ron Carey, and the President of Local 728, gath-
ered in the facility's driveway area. See Brief of the Petition-
er at 13-14. Overnite charges that employees were subjected 
to intimidation, coercion, surveillance, and electioneering by a 
group of supporters who held a "raucous" rally within earshot 
of the polling station and within sight of employees waiting to 
vote. See id. at 14-15. Members of the pro-union crowd 
were seen taking videos and photographs, while Maddox was 
present. See id. at 16-17. At least one employee was 
concerned that the union would use the video and photo-
graphs to retaliate against pro-company employees. See id. 
at 17. At no time, Overnite argues, did the union provide an 
explanation to employees for the videotaping and photogra-
phy. See id. at 18.

 In the April 17, 1995 election, 136 employees voted for 
union representation, and 100 voted against; there were only 
four challenged ballots. See Tally of Ballots at Joint Appen-
dix ("J.A.") 6-7. Overnite filed 12 objections to the election. 
See Employer's Objections to Conduct Affecting the Results 
of the Election (April 22, 1995). The objections included 
allegations that the union had engaged in unlawful surveil-
lance, coercion, intimidation, and harassment by videotaping 
employees known to be company supporters in the break 
room on April 14, 1995 (Objection 1), had engaged in similar 
conduct on election day by photographing employees as they 
entered and exited the company's premises (Objection 4), and 
had engaged in unlawful electioneering within the no-


electioneering zone (Objection 5). See id. The Regional 
Director conducted an administrative investigation of the 
objections pursuant to which he issued a Supplemental Deci-
sion and Certification of Representative overruling all of the 
objections and certifying the union as the employees' collec-
tive-bargaining representative. Soon thereafter, Overnite 
filed a request for review of the decision with the Board. By 
order dated March 20, 1996, the Board remanded Objections 
1, 4, and 5 for a hearing, but denied the request for review in 
all other respects.

 On May 31, 1996, the Hearing Officer issued his Report and 
Recommendations on Objections, in which he found that the 
objections were without merit and recommended that the 
Board dismiss them and certify the election results. Overnite 
filed exceptions to the Hearing Officer's Report. Nonethe-
less, on February 7, 1997, the Board adopted the Hearing 
Officer's findings and recommendations and certified the un-
ion as the exclusive bargaining representative for Overnite's 
Atlanta employees. Overnite filed a Motion for Reconsidera-
tion in light of the Board's pending consideration of two cases, 
Flamingo Hilton-Reno, Case No. 32-CA-14378 and Randell 
Warehouse of Arizona, Inc., Case No. 28-RC-5274 (June 12, 
1996), in which it claimed the Board was expected to clarify 
the standards for videotaping and photography during union 
elections. The Board denied the motion on March 20, 1997.

 By letter dated February 12, 1997, Overnite notified the 
union that it would not recognize or bargain with it. See J.A. 
122A. The union subsequently filed an unfair labor practice 
charge alleging that the company's refusal to bargain violated 
sections 8(a)(1) and (5) of the Act, 29 U.S.C. ss 158(a)(1) and 
(5). See J.A. 123. One month later, the Board issued a 
complaint alleging that Overnite violated sections 8(a)(1) and 
(5) of the Act. Overnite answered and the General Counsel 
moved for summary judgment. On May 30, 1997, a three-
member panel of the Board issued its Decision and Order 
concluding that Overnite's refusal to bargain with the union 
violated sections 8(a)(1) and (5) of the Act. Accordingly, it 
ordered Overnite to bargain with the union upon request, 


embody an understanding in a signed agreement, and post an 
appropriate notice. See Overnite Transp. Co., 323 N.L.R.B. 
No. 145 (May 30, 1997). Overnite filed its Petition for Review 
of the Board's Decision and Order on June 10, 1997. The 
Board filed a cross-application for enforcement of its order.

 II. Discussion

 A.The Board Reasonably Determined that Videotaping 
 and Photographing of Employees Did Not Constitute 
 Surveillance Sufficient to Invalidate the Election

 Overnite claims that the bargaining order issued by the 
Board should not be enforced because pre-election and elec-
tion day video and photographic surveillance destroyed the 
conditions required for a free and fair election. Overnite 
argues that the Board was incorrect to conclude that the 
videotaping and photography by McConley and others was 
not fairly attributable to the union. Accordingly, because 
McConley and the others were union representatives, Over-
nite contends, the election must be set aside if their conduct 
" 'reasonably tends to interfere with employees' free and 
uncoerced choice in the election.' " See Brief of the Petition-
er at 29 (quoting Pepsi-Cola Bottling Co., 289 N.L.R.B. 736, 
736 (1988) (emphasis added by Petitioner)). Even if the 
Board were correct to conclude that all but one of the videos 
and photographs were taken by third parties, Overnite con-
tinues, the election should still be set aside because the 
surveillance created " 'an atmosphere of fear and reprisal 
such as to render a free expression of choice impossible.' " 
Id. at 29-30 (quoting Millard Processing Serv., Inc., v. 
NLRB, 2 F.3d 258, 261 (8th Cir.1993), cert. denied, 510 U.S. 
1092 (1994) (emphasis added by Petitioner)). The NLRB, in 
turn, argues that the Board's finding that the videotaping and 
photography was not attributable to the union (except for the 
union meeting incident) was reasonable and supported by the 
evidence and thus it was reasonable for the Board to apply 
the less stringent third-party standard to evaluate the legality 
of the election. The NLRB further says that the Board's 
conclusion that the videotaping and photography by the third 
parties (and in one instance by a union representative) did not 


constitute surveillance sufficient to invalidate the election was 
also reasonable and supported by the evidence. We affirm 
the Board's decision.

1.Pro-union employees were third parties, not union 
 agents

 We begin by resolving a threshold issue: whether those 
who engaged in videotaping and photographing did so as 
agents of the union or whether they were simply third 
parties, albeit enthusiastic pro-union supporters. In consid-
ering claims of election misconduct, the Board and the courts 
have long recognized a distinction between actions of a party 
to the election and those of employees or other third parties. 
See, e.g., NLRB v. Herbert Halperin Distributing Corp., 826 
F.2d 287 (4th Cir. 1987). This distinction is based on a 
recognition that "[n]ot every employee who supports the 
union or speaks in its favor is a union agent" and "neither the 
union nor the employer can control everything these employ-
ees say or do." Id. at 291 (citations omitted). Where election 
misconduct is attributable to one of the parties, the Board will 
overturn the election if the misconduct "created such an 
environment of tension and coercion ' "as to have had a 
probable effect upon the employees' actions at the polls" ' and 
to have ' "materially affected the results of the election." ' " 
Swing Staging Inc. v. NLRB, 994 F.2d 859, 861-62 (D.C. Cir. 
1993) (quoting Amalgamated Clothing Workers v. NLRB, 424 
F.2d 818, 827 (D.C. Cir. 1970) (citation omitted)). Where 
misconduct is attributable to third parties, however, the 
Board will overturn an election only if the misconduct is "so 
aggravated as to create a general atmosphere of fear and 
reprisal rendering a free election impossible." Westwood 
Horizons Hotel, 270 N.L.R.B. 802, 803 (1984).

 In considering questions of agency under the National 
Labor Relations Act (NLRA), we turn to section 2(13) of the 
Act, which provides as follows: "In determining whether any 
person is acting as an 'agent' of another person so as to make 
such other person responsible for his acts, the question of 
whether the specific acts performed were actually authorized 
or subsequently ratified shall not be controlling." 29 U.S.C. 


s 152(13) (1994). The Board applies ordinary common law 
principles of agency in deciding issues of agency under sec-
tion 2(13). See International Longshoremen's Ass'n v. 
NLRB, 56 F.3d 205, 212 (D.C. Cir. 1995), cert. denied, 516 
U.S. 1158 (1996) ("the legislative history of that statute makes 
clear that it was designed to render 'both employers and 
labor organizations ... responsible for the acts of their 
agents in accordance with the ordinary common law rules of 
agency' ") (citations omitted); Local 1814, Int'l Longshore-
men's Ass'n v. NLRB, 735 F.2d 1384, 1394, cert. denied, 469 
U.S. 1072 (1984) ("Beyond doubt, the legislative intent of this 
provision was to make the ordinary law of agency applicable 
to the attribution of individual acts to both employers and 
unions."); see also H.R. Conf. Rep. No. 80-510 at 36 (1947), 
reprinted in 1947 U.S.C.C.A.N. 1135, 1142 ("[B]oth employers 
and labor organizations will be responsible for the acts of 
their agents in accordance with the ordinary common law 
rules of agency."). Thus, the Board must apply the common 
law meaning of the terms "agency" and "apparent authority" 
in determining whether the union will be held responsible for 
the acts of one of its members.

 Since Congress did not delegate to the Board the power to 
interpret section 2(13) of the NLRA, the Board's determina-
tion of whether a particular actor is properly considered an 
agent or was acting with apparent authority is granted only 
limited deference. In other words, the court "need not defer 
to the agency's judgment as we normally might under the 
doctrine of Chevron U.S.A. Inc. v. Natural Resources Defense 
Council, Inc., 467 U.S. 837, 843, 104 S. Ct. 2778, 2781, 81 L. 
Ed. 2d 694 (1984)." 56 F.3d at 212. However, the standard 
of review is not de novo. We have previously held that "the 
existence of an agency relationship is a factual matter ... 
which cannot be disturbed if supported by 'substantial evi-
dence on the record considered as a whole.' " Local 1814, 
Int'l Longshoremen's Ass'n, 735 F.2d at 1394. Elsewhere, we 
have explained that common law agency questions are " 'per-
meated at the fringes by conclusions drawn from the factual 
setting of the particular industrial dispute,' " and therefore 
"we must give due weight to the Board's judgment to the 


extent that 'it made a choice between two fairly conflicting 
views.' " International Longshoremen's Ass'n, 56 F.3d at 
212 (citation omitted); see C.C. Eastern, Inc. v. NLRB, 60 
F.3d 855, 858 (D.C. Cir. 1995) (noting that in resolving issues 
requiring reference to the common law of agency, the court 
does not review the Board's determination de novo, but 
instead will "uphold the Board if it can be said to have 'made 
a choice between two fairly conflicting views' ") (citation 
omitted). Read together, these cases stand for the proposi-
tion that we review the Board's agency law decisions to 
determine whether its decision is reasonable, consistent with 
its prior decisions, supported by substantial evidence, and 
consistent with common law determinations on similar facts. 
In doing so, we must bear in mind that "[t]ransplantation of 
ordinary agency law, which arises out of ordinary contract 
and tort disputes, into the NLRA context necessarily requires 
sensitivity to the particular circumstances of industrial labor 
relations." Local 1814, Int'l Longshoremen's Ass'n, 735 F.2d 
at 1394.

 Both parties acknowledge that Dennis McConley and the 
other union supporters' conduct was not expressly authorized 
by the union. However, Overnite argues that they had 
apparent authority to act on behalf of the union because 
McConley was a member of the Union Organizing Committee 
and campaigned aggressively for the union, McConley stood 
on the podium with union officers during a union meeting, 
McConley was in a photograph with the Union International 
President placed on a union flyer, and at least some of the 
"surveillance" took place in the presence of union officials.

 "Apparent authority" exists where the principal engages in 
conduct that "reasonably interpreted, causes the third person 
to believe that the principal consents to have the act done on 
his behalf by the person purporting to act for him." Restate-
ment (Second) of Agency s 27 (1992). For there to be 
apparent authority, however, the third party must not only 
believe that the individual acts on behalf of the principal but, 
in addition, "either the principal must intend to cause the 
third person to believe that the agent is authorized to act for 


him, or he should realize that his conduct is likely to create 
such belief." Id. at cmt. a.

 The fact that McConley and Reeves were members of the 
Union Organizing Committee, alone, is not sufficient to confer 
apparent authority on them. The Hearing Officer found that 
the Union Organizing Committee was not a formally struc-
tured organization formed by the union; the Committee was 
entirely voluntary and members were not paid. Although the 
Hearing Officer found that International Organizer Keith 
Maddox visited the Atlanta facility, there was no evidence 
that he gave any specific directives to employees on the 
Committee. In Amalgamated Clothing and Textile Workers 
Union v. NLRB, 736 F.2d 1559 (D.C. Cir. 1984), we said mere 
membership in an in-plant organizing committee is not suffi-
cient, by itself, to make the actions of an individual attribut-
able to the union. See id. at 1565 (holding that members of 
in-plant organizing committee, which supported the organiz-
ing campaign, drafted, endorsed and distributed leaflets, so-
licited employees to join the union, wore pro-union insignia, 
and made visits to the homes of fellow employees to urge 
them to support the union, were not agents of the union, in 
part because "none of the IPOC members held official posi-
tions with the union, received formal training or instruction 
from the union, or were paid by the union for their work on 
the campaign"); see also Kux Mfg. Co. v. NLRB, 890 F.2d 
804 (6th Cir. 1989) (finding conduct of members of in-plant 
organizing committee not attributable to union); Uniroyal 
Technology Corp. v. NLRB, 98 F.3d 993 (7th Cir. 1996) 
(upholding Board's determination that member of in-plant 
organizing committee was not an agent of the union where he 
did not have substantial union responsibilities); NLRB v. 
Herbert Halperin Distributing Corp., 826 F.2d 287, 290-91 
(4th Cir. 1987) (upholding Board's determination that employ-
ees were not agents of the union where the union's profes-
sional staff was heavily involved in the campaign and where 
union did not rely primarily on employees to organize the 
other workers). Overnite presented no evidence that the 
union encouraged any belief among employees that McConley 
had union allowance to engage in videotaping in the break 


room. Nor was there evidence that the union ratified 
McConley's videotaping activity by viewing or distributing it, 
or by showing it to employees. Thus, while it may be the 
case that several employees did in fact believe that McConley 
acted on behalf of the union, the union cannot be held 
responsible for McConley's conduct because it did nothing to 
confer apparent authority upon him.

 The same is true of the other union supporters who photo-
graphed and took videotapes of various Overnite employees. 
The only evidence that Overnite offers in support of its case 
for apparent authority is the fact that union officials were 
present when these unidentified employees took photographs 
and videotapes 1; in essence, Overnite argues that the union 

__________
 1 Overnite argues that it was entitled to inferences that the 
unidentified employees were authorized or encouraged to engage in 
surveillance by union officials and that the "surveillance" was 
intended to be used for purposes of intimidation and retaliation 
because the union failed to present testimony denying those propo-
sitions. We explained the adverse inference rule in International 
Union (UAW) v. NLRB, 459 F.2d 1329 (1972) as follows:

 The theory behind the rule is that, all other things being equal, 
 a party will of his own volition introduce the strongest evidence 
 available to prove his case. If evidence within the party's 
 control would in fact strengthen his case, he can be expected to 
 introduce it even if it is not subpoenaed. Conversely, if such 
 evidence is not introduced, it may be inferred that the evidence 
 is unfavorable to the party suppressing it.

Id. at 1338. Although the courts can reverse the Board for an 
unexplained failure to draw the inference, see, e.g., NLRB v. Selwyn 
Shoe Mfg. Corp., 428 F.2d 217, 225 (8th Cir. 1970); NLRB v. Ford 
Radio & Mica Corp., 258 F.2d 457, 463 (2d Cir. 1958), the decision 
of whether to draw an adverse inference has generally been held to 
be within the discretion of the fact finder. See, e.g., International 
Union, 459 F.2d at 1339. Here, there was good reason for the 
union to believe that Overnite had failed to meet its burden of proof, 
therefore the decision of the Board not to draw an adverse infer-
ence against the union was rational and consistent with this court's 
and the Board's previous decisions. See, e.g, id. at 1338 ("Of 
course, if a party has good reason to believe his opponent has failed 


officials should have realized that their failure to take action 
to prevent pro-union employees from photographing and vid-
eotaping other employees would foster the belief the picture-
takers were authorized to act on behalf of the union. The 
Hearing Officer said "no" to this proposition. Indeed, he 
labeled the evidence "grossly insufficient" to support that 
notion, noting that Overnite had "presented no evidence that 
any of the union officials engaged in, condoned, or ratified any 
of the conduct presented by testimonial evidence." J.A. 53 
n.18. Based on the evidence before us, we conclude that the 
Hearing Officer was right. The simple fact that a union 
official stood nearby while a pro-union employee took pictures 
is not enough to confer apparent authority on the employee, 
particularly where there was no evidence that union officials 
made or attempted to make use of the photographs or 
videotapes or even viewed the tapes and photographs.

 Evidence that the union supporters who participated in the 
pro-union gathering outside the Atlanta facility on election 
day had apparent authority to act on behalf of the union is 
also lacking. Overnite claims that the union supporters 
yelled loudly, leafleted individuals entering the voting place, 
operated a large cookout, and engaged in excessive horn 
blowing easily heard inside the polling place, as well as 
photographed and videotaped employees around the election 
facility. In support of its claim that these union supporters 
were agents of the union Overnite offers the fact that several 
union officials were present and observed these activities. 
Overnite also claims that the election day gathering was a 
"picket line," and that the union was therefore responsible for 
keeping the gathering under control and can be held respon-
sible for the actions of those in attendance.2

__________
to meet his burden of proof, he may find no need to introduce his 
strong evidence.") (citation omitted).

 2 It is well-settled that when a union pickets an employer, it 
empowers picketers to act on behalf of the union, see, e.g., Dairy 
Employees, Local 695, 221 N.L.R.B. 647, 653 (1975), and that if the 
union fails to control the line, it can be held responsible for those in 


 Again, however, this evidence is insufficient to show appar-
ent authority to act on behalf of the union. The mere 
presence of union officials at a gathering is insufficient to 
grant all participants apparent authority to act on behalf of 
the union. Moreover, the gathering clearly was not a picket 
line. Not every gathering arranged by the union can be 
called a picket line; in order for there to be a picket line 
there must be some evidence that the union organized a 
picket line and exercised control over it. See, e.g., Dairy 
Employees Local 695, 221 N.L.R.B. 647, 653 (1975) (holding 
that picket line existed where pickers were paid by union and 
received instructions from picket captains who attended daily 
union meetings); Boilermakers Local 696, 196 N.L.R.B. 645, 
646 (1972) (holding that picket line existed where union 
assigned picket captains and individual pickets to shifts). 
Here, there was no evidence that a union official directed the 
activities of or assigned responsibilities to those who attended 
the gathering and engaged in the complained of activity. 
Faced with a somewhat parallel situation and similar argu-
ments, the Seventh Circuit recently held: "In our view, the 
union's efforts to pump up the electorate and inspire enthusi-
asm for the union cause did not transform the assorted 
supporters and revelers who spent all or part of the day in 
front of Overnite's terminal into union agents. The union's 
actions were notable not for their express direction of those 
persons' actions, but for their passivity." Overnite Transp. 
Co. v. NLRB, 104 F.3d 109, 114 (7th Cir. 1997). Similarly, 
here, the existence of the pro-union gathering outside the 
polling place did not transform participants into agents of the 
union.

2.The Board reasonably determined that third-party 
 misconduct did not create an atmosphere of fear and 
 reprisal

 Concluding, then, that all but one of the union supporters 
who engaged in the activity complained about were not union 
agents but instead third parties, we turn to the second step of 
the analysis: Was the misconduct nonetheless "so aggravated 

__________
attendance, see, e.g., United Tel. Answering and Communications 
Serv. Union, Local 780, 276 N.L.R.B. 507, 510 (1985).


as to create a general atmosphere of fear and reprisal render-
ing a free election impossible?" Westwood Horizons Hotel, 
270 N.L.R.B. 802, 803 (1984). We affirm the Board's negative 
answer to that question.

 The videotaping in the break room by McConley was 
insufficient to create an atmosphere of fear and reprisal. 
Although a few employees may have feared that the videotape 
could be used to retaliate against them, there is no evidence 
that McConley suggested any such use. Moreover, the Hear-
ing Officer found no evidence that information about the 
break room incident was widely disseminated among employ-
ees at the Atlanta Service Center. Thus Overnite has not 
demonstrated that the videotaping, without more, interfered 
with employee free choice, and the Board's conclusion that it 
was not sufficient grounds for overturning the union election 
was entirely reasonable.

 The other incidents of videotaping and photography of 
Overnite employees by unidentified union supporters--con-
sidered both individually and cumulatively (as well as in 
conjunction with the other misconduct alleged)--did not cre-
ate an atmosphere of fear and reprisal either. Only one 
employee, Parker Roberts, asserted any concern that the 
election day videotaping would be used to intimidate him, see 
Transcript at 465-66 (May 9, 1996) (testimony of Parker 
Roberts), and he admitted that he did not personally receive 
any threats, see id. at 469. Here again there was no evidence 
that any incidents of photography and videotaping were wide-
ly discussed by the employees at the facility or that other 
employees felt intimidated. The election day gathering at 
which the photography and videotaping took place was de-
scribed by Roberts himself as having a "sort of a party 
attitude," id. at 489, and by another pro-company employee 
as "friendly." Transcript at 428-29 (May 9, 1996) (testimony 
of Albert Williams). Thus, the Board could reasonably con-
clude that the photography and videotaping by unidentified 
pro-union employees on election day did not create an atmo-
sphere of fear and reprisal so as to render a free election 
impossible. See, e.g., Nu Skin Int'l, Inc., 307 N.L.R.B. 223, 
224-35 (1992) (finding no coercion when union agents photo-


graphed employees at union-sponsored picnic); Friendly Ice 
Cream Corp., 211 N.L.R.B. 1032, 1033, enforced, 503 F.2d 
1396 (1st Cir. 1974) (finding photography by pro-union em-
ployees at a company dinner did not create an atmosphere of 
fear and coercion rendering a free election impossible). The 
Board could also reasonably conclude that the impact of the 
election day conduct in conjunction with prior videotaping and 
photography incidents was insufficient to warrant overturning 
the election. See Amalgamated Clothing and Textile Work-
ers v. NLRB, 736 F.2d 1559, 1569 (D.C. Cir. 1984) (noting 
that the cumulative impact of allegedly objectionable conduct 
" 'may not be used to turn a number of insubstantial objec-
tions to an election into serious challenge' ") (citation omit-
ted).

3.The Board reasonably determined that the union hall 
 videotaping by Local 728's Secretary did not material-
 ly affect the results of the election

 Both parties agree that Local 728's Secretary was a union 
agent. In this one instance, therefore, the court must deter-
mine whether it was reasonable for the Board to conclude 
that her actions did not "create[ ] such an environment of 
tension and coercion ' "as to have had a probable effect upon 
the employees' actions at the polls" ' and to have ' "materially 
affected the results of the election." ' " Swing Staging Inc. v. 
NLRB, 994 F.2d 859, 861-62 (D.C. Cir. 1993) (quoting Amal-
gamated Clothing Workers v. NLRB, 424 F.2d 818, 827 (D.C. 
Cir. 1970) (citation omitted)). We hold that it was.

 Although the videotaping may have made some employees 
uncomfortable, the record does not support a finding that the 
incident created such an environment of tension and coercion 
as to have had a probable effect upon the employees' actions 
at the polls or to have materially affected the results of the 
election. The Board has previously found, in Nu-Skin Int'l, 
Inc., 307 N.L.R.B. 223 (1992), that it is permissible for the 
union to take pictures of employees who voluntarily attend a 
union-sponsored picnic. See id. at 224-25. Here, as in Nu-
Skin, the employees voluntarily attended the union meeting, 
which was held off-premises. And, again as in Nu-Skin, no 


evidence was presented that any threats of retaliation were 
made in conjunction with the videotaping by any union official 
at any time. Indeed, no individual or group of individuals 
were ever singled out to be videotaped. Thus, we affirm the 
Board's holding that the offsite incident of union videotaping 
of employees who attended a union hall meeting did not rise 
to the level of unlawful surveillance or misconduct sufficient 
to set the election aside.

 B.The Board Reasonably Found That There Was No Un-
 lawful Electioneering

 Overnite claims finally that there was unlawful electioneer-
ing by the union and its supporters in front of the voting 
place on election day. Union supporters not only engaged in 
surveillance of employees entering the polling center, but 
they also held a "raucous" rally near the polling center, which 
was attended by International Organizer Maddox, Teamsters 
International President Carey, and the President of Local 
728. According to the company, union supporters who ran 
the gathering held a cookout, which Overnite estimates in-
cluded 100 employees at various points, and dispensed free 
food and drink. The crowd engaged in constant "hooting and 
hollering" and chanted slogans, and Teamster drivers from 
other trucking companies honked their horns as they drove 
by the gathering. The effect of this activity, Overnite argues, 
was to destroy the "laboratory conditions," General Shoe 
Corp., 77 N.L.R.B. 124, 127 (1948), that must be present on 
election day to ensure a free and fair election. Therefore this 
court should refuse to enforce the bargaining order issued by 
the Board.

 The Hearing Officer, however, found that Overnite "pre-
sented no evidence that any union supporter approached any 
employee while that person was waiting in line to vote," or 
that there was even "an established 'no-electioneering zone' at 
the polling place." Hearing Officer's Report and Recommen-
dations on Objections (May 31, 1996) at 22. The Hearing 
Officer also found that Overnite had presented no evidence of 
any campaign rhetoric or appeals for votes from union sup-
porters as employees waited in line to vote. Finally, the 


Hearing Officer found that the company had presented no 
evidence that union officials encouraged the horn blowing by 
Teamster truckers or that employees complained about it. 
See id. at 22-23. Thus, the Hearing Officer concluded that 
there was no unlawful electioneering, and the Board adopted 
his findings. We affirm the Board's holding.

 The Board does not prohibit all electioneering in the vicini-
ty of the polling place on election day. Indeed, the Board has 
recognized that "it is unrealistic to expect parties or employ-
ees to refrain totally from any and all types of electioneering 
in the vicinity of the polls." Boston Insulated Wire & Cable 
Co., 259 N.L.R.B. 1118, 1118 (1982), enforced, 703 F.2d 876 
(5th Cir. 1983); see also NLRB v. Hudson Oxygen Therapy 
Sales Co., 764 F.2d 729, 732 (9th Cir. 1985) (holding that "the 
Board permits legitimate 'electioneering' subject to specific 
regulations"). Instead, the Board considers a range of fac-
tors and circumstances in determining whether electioneering 
activity is sufficient to justify overturning an election. First, 
it determines whether the activity violates the Milchem rule 
prohibiting "prolonged conversations between representatives 
of any party to the election and voters waiting to cast 
ballots." Milchem, Inc., 170 N.L.R.B. 362, 362-63 (1968). 
Here, that rule is not implicated at all because Overnite 
presented no evidence that any union supporter approached 
any employee while she was waiting in line to vote. More-
over, Milchem applies only to conduct by agents of the 
parties to the election, see NLRB v. Hood Furniture Mfg. 
Co., 941 F.2d 325, 329 (5th Cir. 1991), and there was no 
evidence indicating that the truckers who blew their horns 
while passing the facility or the union supporters who chanted 
slogans at the gathering were union agents clothed with 
actual or apparent authority to act on behalf of the union.3

__________
 3 This finding is consistent with the Seventh Circuit's decision in 
Overnite Transp. Co. v. NLRB, 104 F.3d 109 (7th Cir. 1997), which 
involved a fact situation almost identical to the case at hand. 
There, the court affirmed the Board's conclusion that "the group 
were [sic] nothing more than boisterous union supporters and 
sympathizers." Id. at 114.


 Where an employer objects to electioneering not encom-
passed within the Milchem rule, the Board will overturn the 
election only if the electioneering " 'substantially impaired the 
exercise of free choice.' " NLRB v. Del Rey Tortilleria, Inc., 
823 F.2d 1135, 1140 (7th Cir. 1987) (citation omitted). The 
Board generally considers the nature and extent of the elec-
tioneering, whether it happened within a designated "no 
electioneering" area, whether it was contrary to the instruc-
tions of the Board's election agent, whether a party to the 
election objected to it, and whether a party to the election 
engaged in it. See id. In the case at hand, Overnite has 
failed to demonstrate that there was any designated "no 
electioneering" area, that there were any instructions issued 
by a Board agent, that any party objected to the activities of 
the union supporters prior to or during the election, or that 
the union was responsible for directing or participating in the 
objectionable activity. Under these circumstances, it was 
entirely reasonable for the Board to refuse to overturn the 
results of the election.

 C.The Board Reasonably Refused to Delay Certification of 
 the Union Pending Its Decisions in Flamingo Hilton-
 Reno and Randell Warehouse

 Overnite sought rehearing of the Board's decision in this 
case based upon the pendency of the full Board's decision in 
two forthcoming cases. A panel of the Board denied the 
motion "as raising nothing not previously considered." Order 
Denying Motion for Reconsideration (March 20, 1997). Over-
nite asks for a remand of this case to the Board for further 
proceedings because the Hearing Officer and the Board relied 
on case law that the Board has indicated may no longer be 
valid. In particular, Overnite argues that this case should be 
decided in light of the Board's forthcoming decisions in 
the consolidated cases, Flamingo Hilton-Reno, Case No. 
92-CA-14378, which involved videotaping employees for a 
pro-company video to be shown to all the employees prior to a 
union election, and Randell Warehouse of Arizona, Inc., Case 
No. 28-RC-5274, which involved photography of employees 
by union officials for use in campaign propaganda. Overnite 
points to Allegheny Ludlum Corp. v. NLRB, 104 F.3d 1354, 


1363 (D.C. Cir. 1997), as support that this court should 
remand cases to the Board when the Board has failed to 
provide "some clear guidelines" regarding the critical issues 
in the case.

 The NLRB contends that the Board's denial of the motion 
for reconsideration was a reasonable exercise of its discretion. 
The issues in this case, it claims, are substantially different 
from the issues presented in Flamingo Hilton-Reno and 
Randell Warehouse. In those two cases, the NLRB explains, 
the parties to the election were responsible for the videotap-
ing and photographing of employees. Here, however, all but 
one of the incidents of videotaping and photography were not 
attributable to the union but instead to third-party union 
supporters. Contrary to Overnite's assertion that the legal 
standards in this area are unclear, the NLRB claims that the 
standard for assessing the legality of third-party conduct has 
been both clear and consistent. Moreover, the NLRB claims 
that Overnite's reliance on Allegheny Ludlum is misplaced 
because that case involved videotaping and photography by 
an employer, not a third party.

 We affirm the Board's decision because the pending cases 
involve issues that are substantially different from those 
posed by the case at hand. On June 12, 1996, the Board 
issued a Notice of Hearing scheduling oral argument in 
Flamingo Hilton-Reno and Randell Warehouse for August 7, 
1996, and directing the parties to prepare to argue five 
questions, including: "What standard should the Board apply 
to determine whether photographing or videotaping of em-
ployees is an unfair labor practice or objectionable conduct?"; 
"What weight, if any, should the Board give to evidence that 
the purpose of the photographing or videotaping was ex-
plained to employees?"; and "Are there other factors that the 
Board should consider in determining whether photographing 
or videotaping is coercive and/or objectionable conduct?" 
Notice of Hearing, Case No. 32-CA-14378 and Case No. 
28-RC-5274 (June 12, 1996) (quoted in Brief of the Petitioner 
at 23). Although the questions, read broadly, could overlap 
with the issues presented in this case, it appears to us that 
the context in which the issues will be examined is quite 


different. The pending cases involve incidents of surveillance 
attributable to a party to the election, not to third parties. 
With one limited exception, the case at hand involves conduct 
by third parties. Moreover, the pending cases center on 
whether use of videotape and photography in campaign litera-
ture is an unfair labor practice or constitutes objectionable 
conduct and on the tension between protecting the free 
speech interests of the parties and providing a free and fair 
election. These issues are not directly implicated in this case, 
and therefore their resolution is unlikely to have much if any 
effect on the outcome. In addition, the single incidence of 
videotaping by the union of workers who voluntarily attended 
a union meeting was so clearly insufficient to warrant over-
turning the election that it is unnecessary to await the 
Board's decision in the pending case. Thus, the Board was 
well within its province in concluding that Overnite's motion 
for reconsideration raises "nothing not previously considered" 
and therefore lacked merit. Order Denying Motion for Re-
consideration.

 III. Conclusion 

 For the foregoing reasons, we hold that Overnite engaged 
in unfair labor practices within the meaning of sections 8(a)(1) 
and (5) when it refused to bargain with the union as the 
exclusive collective-bargaining representative of Overnite's 
employees. We therefore deny Overnite's petition for review 
and grant the Board's cross-petition for enforcement.

So ordered.